Richard DAVIS and Evelyn
Davis, Plaintiffs,

v.

UNITED STATES GAUGE, a Pennsylvania Corporation and a Wholly–Owned Subsidiary of Ametek, Inc.; and The Victor Equipment Company, a Wholly–Owned Subsidiary of Thermodyme Industries, Defendants.

No. 92–1273–PFK.

United States District Court,
D. Kansas.

Feb. 17, 1994.

William J. Pauzauski, Topeka, KS, for plaintiffs.

Eldon L. Boisseau and Anne M. Hull, of Turner and Boisseau, Chartered, Wichita, KS, for defendant U.S. Gauge.

Ken M. Peterson, Robert W. Coykendall and Diane S. Worth, of Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, KS, for defendant The Victor Equipment Co.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

This is a product liability case. Richard Davis claims he was using his employer's welder when it exploded, injuring Davis' eyes and person. Prior to the explosion, Davis states he had replaced the welder's 4,000 psi (pounds per square inch) gauge with a new gauge his employer had purchased. Davis and his wife filed suit against United States Gauge (U.S. Gauge) and Victor Equipment Company (Victor). The plaintiffs seek recovery pursuant to theories of negligence, strict liability, and breach of implied warranty. Davis' wife also filed a loss of consortium

claim. Victor filed a cross-claim against U.S. Gauge, claiming U.S. Gauge breached the implied warranty of merchantability. Additionally, Victor moves for partial summary judgment.[1]

A hearing was held January 31, 1994, on Victor's partial summary judgment motion, at which time the court announced its decision to deny in part Victor's motion. The court now enters this memorandum and order in accordance therewith.

In its motion for summary judgment, Victor argues Davis' wife has no standing to assert a claim for loss of consortium under K.S.A. § 23–205. The plaintiffs agree and state Evelyn Davis' name will be removed from the petition. Consequently, summary judgment is appropriate on this issue. There remains one plaintiff, Richard Davis.

■ Victor also argues the retailer exception to the Kansas Product Liability Act (KPLA) entitles it to judgment as a matter of law because Victor was a mere reseller of the gauges and was under no duty to test the gauges independently. The retailer exception provides:

A product seller shall not be subject to liability in a product liability claim arising from an alleged defect in a product, if the product seller establishes that:

(a) Such seller had no knowledge of the defect;

(b) such seller in the performance of any duties the seller performed, or was required to perform, could not have discovered the defect while exercising reasonable care;

(c) the seller was not a manufacturer of the defective product or product component;

(d) the manufacturer of the defective product or product component is subject to service of process either under the laws of the state or Kansas or the domicile of the person making the product liability claim; and

(e) any judgment against the manufacturer obtained by the person making the

product liability claim would be reasonably certain of being satisfied.

K.S.A. 60–3306.

For purposes of summary judgment, Victor assumes Davis' employer purchased the gauge in question from Brown Welding Supply, who purchased it from Victor, who in turn purchased it from U.S. Gauge. Additionally, Victor assumes the subject gauge had the faceplate of a 4,000 psi gauge, but the inner workings of a 30 psi gauge, and that it exploded when Davis employed the gauge as a 4,000 psi gauge.

Granting summary judgment on this issue is premature. Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue regarding any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The existence of some disputed facts automatically does not preclude granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). An issue of fact is material if it "might affect the outcome of the suit." *Id.* at 248, 106 S.Ct. at 2510. A material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All factual disputes must be resolved in favor of the nonmoving party. *White v. General Motors Corp., Inc.*, 908 F.2d 669, 670 (10th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991); *see National Gypsum Co. v. Dalemark Indus., Inc.*, 773 F.Supp. 1476, 1482 (D.Kan.1991) ("Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach difference conclusions, summary judgment is inappropriate."). A motion for summary judgment requires the court to examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512. The moving party must prove entitlement to summary judg-

---

1. Victor does not seek judgment on its cross-    claim against U.S. Gauge.

ment beyond a reasonable doubt. *Norton v. Liddel,* 620 F.2d 1375, 1381 (10th Cir.1980).

Davis and Victor dispute whether Victor is a manufacturer. This is a genuine issue regarding material facts because the retailer exception does not apply to a manufacturer.

Victor states it does not make gauges; rather, it primarily is in the business of "manufacturing oxy fuel and air fuel, welding and cutting equipment, pressure regulators for the industrial market, and Food and Drug Administration control regulators for the medical market." (Victor's Memo., Fact No. 2.) Victor buys approximately one million gauges from U.S. Gauge each year and incorporates 95% of those gauges into regulators Victor manufactures or assembles. Victor sells the other 5% to retailers.

Relying upon the KPLA definition of manufacturer, Davis maintains Victor has held itself out as a manufacturer because it packages for resale the gauges it sells individually into boxes with the Victor label. *See* K.S.A. § 60–3302(b) (1992 Supp.) (manufacturer "includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer"); *see also* K.S.A. § 60–3302(a) (1992 Supp.) (product seller includes an "entity ... engaged in the business of selling products, whether the sale is for resale, or for use or consumption" and encompasses the "manufacturer, wholesaler, distributor or retailer of the relevant product"). Victor uses the same size box to package different psi gauges; the Victor label indicates which psi gauge is enclosed. More importantly, one side of the box states, "Victor ... You deserve the best," with Victor's corporate address on the other side. (Pltf.'s Response at 1–2; U.S. Gauge's Response, Add'l Fact No. 4.)

Victor replies the "holding out" portion of the definition of manufacturer is not applicable on the instant facts because U.S. Gauge's name appears on the gauges' faceplates, because U.S. Gauge admitted to manufacturing the gauge at issue, and because there has never been a question about "the identity of the true manufacturer." (Victor's Reply at 2–3, 9; *see* Ex. A.) In support of the latter, Victor points to the fact Davis first sued U.S. Gauge and then amended his complaint to add Victor as a defendant. According to Victor, it is a question of law, not a question of fact, whether Victor is a manufacturer within the meaning of the KPLA. Evidently, Victor is arguing packaging, as a matter of law, is not sufficient to conclude a reseller held itself out as a manufacturer.

Both Davis and Victor discuss *Alvarado v. J.C. Penney Co., Inc.,* 713 F.Supp. 1389 (D.Kan.1989), *modified in part,* 735 F.Supp. 371 (D.Kan.1990), and Professor Westerbeke's commentary on the KPLA. In *Alvarado,* a similar issue was raised. The plaintiff filed a product liability suit against J.C. Penney, Co., Inc. (Penney) after an open-flame gas heater ignited the nightgown and robe she purchased from Penney and she suffered severe burns. Penney raised the retailer exception, K.S.A. § 60–3306, claiming it was not the manufacturer. There was evidence other companies had manufactured the garments even though Penney had put its label on the clothing. Judge Rogers found there was a factual dispute regarding whether the garments contained Penney's label. If Penney had put its label on the garments, Judge Rogers concluded Penney could be deemed a manufacturer pursuant to K.S.A. § 60–3302(b), and for support cited Professor Westerbeke, who has stated:

[T]he "holding out" exclusion ... applies to the retailer who sells a private label product that is manufactured by another, but bears the retailer's own name.... For example, consider the hypothetical case of the retail grocery chain that sells under its private label a food product canned by another, and one can contains a harmful foreign object that injures a consumer. Even though all other requirements for nonliability are met, the retailer cannot use [K.S.A. § 60–3306] to avoid liability. Yet eventually the retailer will recover full indemnity from the actual manufacturer, and the final allocation of loss is the same as if [§ 60–3306] had been applied. The only difference is that the process used to reach that final result involves the unnecessary burdens and inefficiencies that gave rise to [§ 60–3306].

William E. Westerbeke, *Some Observations on the Kansas Product Liability Act (Part*

2), 54 J.Kan.B.Ass'n 39, 48 (1985); *see Alvarado,* 713 F.Supp. at 1393.

Davis maintains the only difference between the instant facts and *Alvarado* is that in the instant case U.S. Gauge's name is on the faceplate of the gauge. According to Davis, the question is whether Victor's packaging of the gauges in boxes displaying Victor's advertising misled consumers into believing Victor manufactured the gauge.

Victor argues *Alvarado* is distinguishable from the instant facts because the nightgown and robe contained no label identifying the actual manufacturer and because the manufacturer was not known and was not available as a defendant. Victor cites another Professor Westerbeke article for the proposition that "a nonmanufacturing reseller will be held liable [only if] the manufacturer is unknown, not subject to jurisdiction, or unable to pay the judgment." (Victor's Reply at 8.) *See* William E. Westerbeke, *Kansas Products Liability: Joint and Several Liability in the Chain of Supply and Distribution,* J.Kan.Trial Law.Ass'n, Jan. 1991, at 21, 22. This article focuses upon Professor Westerbeke's belief "that Kansas courts should retain joint [liability] among parties in the chain of supply and distribution in strict products liability actions." *Id.* at 21. In the context of strict liability, Professor Westerbeke wrote:

> The application of several liability to mere distributive parties would render [K.S.A. § 60–3306] meaningless. A distributive party not actually at fault could be kept in a lawsuit even though no judgment could be rendered against it. In fact, the only reasonable interpretation of this provision is that a not-at-fault distributive party is jointly liable with the manufacturer when the manufacturer is not subject to jurisdiction or not able to pay its judgment. In essence, the distributive party is jointly liable for the traditional reasons, i.e., as an alternative source of compensation when the manufacturer is unavailable either as a formal party or as a source of compensation. The burden then falls on

the distributive party to seek indemnity from the manufacturer.

*Id.* at 22.

■ The statutory definition of manufacturer does not limit the "holding out" portion as Victor contends. The statute provides:

> "Manufacturer" includes a product seller who designs, produces, makes, fabricates, constructs or remanufactures the relevant product or component part of a product before its sale to a user or consumer. It includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer, or that is owned in whole or in part by the manufacturer.

K.S.A. § 60–3302(b) (1992 Supp.).[2] The basis for the KPLA is the Model Uniform Product Liability Act (MUPLA), 44 Fed.Reg. 62,714 (1979). *Patton v. Hutchinson Wil-Rich Mfg. Co.,* 253 Kan. 741, 756, 861 P.2d 1299 (1993). The MUPLA definition of manufacturer includes not only the paragraph quoted above, but a second paragraph Kansas did not adopt, which follows:

> A product seller acting primarily as a wholesaler, distributor, or retailer of a product may be a "manufacturer" but only to the extent that it designs, produces, makes, fabricates, constructs, or remanufactures the product before its sale.

44 Fed.Reg. at 62,717. Thus, the Kansas Legislature had the opportunity to restrict the scope of product sellers qualifying as manufacturers, but chose not to do so. The statutory definition of manufacturer encompasses more than the entity that physically manufactures the product.

■ The "holding out" definition potentially is applicable to this case. Whether Victor held itself out as a manufacturer by repackaging the gauges into boxes labeled Victor is a question of fact, contrary to Victor's assertion.

Additionally, U.S. Gauge takes exception to Victor's second assumption, namely, that the subject gauge had an incorrect faceplate. U.S. Gauge denies the subject gauge left its factory with the wrong faceplate and contends the damage to the subject faceplate

---

**2.** The 1992 amendment to K.S.A. § 60–3302 did not change the definition of manufacturer found at subsection (b). 1992 Kan.Sess.Laws ch. 307, § 5.

was not caused by the explosion, but rather, the faceplate showed evidence of being pried away from a gauge. Nonetheless, U.S. Gauge contends "the trier of fact is entitled to hear the evidence and determine whether Victor, U.S. Gauge, both or neither entity is liable for Davis' injuries." (U.S. Gauge's Response at 7.) According to Victor, this court should disregard U.S. Gauge's response because U.S. Gauge has no standing to object to Victor's motion in that U.S. Gauge has no claims against Victor. Victor cites no authority for this proposition.

Victor also argues summary judgment must be granted because neither the facts of the case nor the common law give rise to a duty that requires Victor to test or inspect the gauges.[3] In support of its argument, Victor cites the following facts: during the manufacturing process, U.S. Gauge tests and calibrates all gauges during the manufacturing process; before shipping, U.S. Gauge again tests and calibrates a random 12% sampling of the gauges.[4] U.S. Gauge's testing and inspection of gauges is the same for gauges sold in bulk and for those individually boxed and sold.[5]

Victor also relies upon the fact U.S. Gauge certifies its gauges as meeting Underwriters Laboratories (UL) and ANSI standards. Davis responds that simply because the gauges satisfy UL and ANSI standards does not mean Victor has complied with the requisite standard of care. In *Pfeiffer v. Eagle Mfg. Co.*, 771 F.Supp. 1133, 1136 (D.Kan. 1991), Judge O'Connor noted that safety standards issued by private entities, such as UL, "have neither the force of law nor are they entitled to the presumption of validity which would be accorded administrative regulations." *See* K.S.A. § 60–3304 (product that complies with legislative or administrative regulatory standards presumed nondefective).

Victor purchases approximately one million gauges from U.S. Gauge annually. Ninety-five percent of those gauges are incorporated into regulators Victor manufactures. Victor tests and inspects the gauges incorporated into the regulators. The only thing Victor does with the gauges repackaged into Victor boxes is to ensure the psi on the faceplate matches that on the box. According to Victor, any defects discovered with the gauges primarily have been with the jerky response of the gauge needle or have been cosmetic, i.e., scratched face or lens. Victor maintains it has never discovered a gauge with a defect similar to that alleged in the instant case in its testing and inspection of approximately 950,000 gauges annually in the past 20 years.

Victor contends that testing 95% of the gauges did not obligate it to test the remaining 5%. Victor points out that its testing never gave it cause to suspect the problem alleged in this case and that its testing of 95% of the gauges was far greater than U.S. Gauge's 12% random testing.

Victor relies upon case law discussing the liability of a nonmanufacturing vendor, particularly *Burgess v. Montgomery Ward & Co.*, 264 F.2d 495 (10th Cir.1959) (applying Kansas law). In *Burgess*, the Tenth Circuit Court of Appeals addressed whether a retail vendor of a product manufactured by a third party is liable for injuries suffered because of a latent manufacturing defect. In holding the retail vendor not liable, the court relied upon Restatement (Second) of Torts § 402 (1948 Supp.), which provides:

> "A vendor of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not subject to liability for harm caused by the dangerous character or condition of the chattel even though he could have discovered it by an inspection or test of the chattel before selling it."

**3.** Pursuant to the retailer exception, the product seller, in order to be free from liability, must establish, among other things, that "such seller in the performance of any duties the seller performed, or was required to perform, could not have discovered the defect while exercising reasonable care." K.S.A. § 60–3306(b).

**4.** Davis maintains the process of attaching the faceplate to the gauge is not inspected.

**5.** Gauges individually boxed and sold also undergo a packaging audit; however, it is not clear if the packaging auditing occurred during the relevant time frame.

1448

The phrase "reason to know" as used in the Restatement does not imply any duty to ascertain an unknown fact.

*Burgess,* 264 F.2d at 498.

Here, as in *Burgess,* there is a latent defect—"discoverable only by the subjection of the device to an appropriate inspection or test." [6] 264 F.2d at 497. There are distinctions, however, between *Burgess* and the case at bar. The *Burgess* court noted the defective product was a ladder, not an inherently dangerous product such as an explosive.[7] *Id.* In *Burgess,* Montgomery Ward made no representations about the ladder, which was not made specifically for Montgomery Ward and which had a label indicating the ladder was made by and under warranty from the Pat Johnson Manufacturing Company. Here, unlike in *Burgess,* Victor was not a mere retail vendor acting as a conduit for the manufacturer. Victor repackaged the product under its own label. *Burgess* is distinguishable from the instant case.

Moreover, Victor overlooks the apparent manufacturer doctrine set forth in Restatement (Second) of Torts § 400 (1965), which

provides: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." [8] Section 400 is consistent with K.S.A. § 60–3302(b) (1992 Supp.). Comment *d* to § 400 explains that "one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark." In such a case, the chattel is used in reliance upon the apparent manufacturer's reputation and care in making the chattel. Comment *d* further clarifies that if

> the real manufacturer or packer is clearly and accurately identified on the label or other markings on the goods, and it is also clearly stated that another who is also named has nothing to do with the goods except to distribute or sell them, the latter does not put out such goods as his own. That the goods are not the product of him who puts them out may also be indicated clearly in other ways.

Victor's packaging does not state Victor had nothing to do with the gauges except to distribute or sell them.

6. U.S. Gauge claims the defect was not latent, "but a defect that would be apparent by simple observations outside just the dial." (U.S. Gauge's Response at 6.) (Victor employees only look at the dial of the gauges.) U.S. Gauge explains:

> Low and high pressure gauges have stems which are not identical. A stem marked "FJ" is for low pressure gauges. A low pressure gauge has a slot for the insertion of the bourdon tube completely through it. The high pressure gauge has only a hole in the center.

(U.S. Gauge's Response at 3.) Davis maintains the defect could have been detected "by looking at the orifice at the inlet of the gauge." (Pltf.'s Response at 2.)

Even if this be true, a patent defect is observable to the seller, buyer, and user. *Burgess,* 264 F.2d at 497. In the instant case, "the defect was latent. Its existence could have readily been determined by a trained person but not by the untrained." *Id.*

7. Davis contends Restatement (Second) of Torts § 402 (1965) is not applicable to the instant case because the gauge is an inherently dangerous product, or at least part of an inherently dangerous product. In support, Davis relies upon the fact that the gauge "sits atop a 4,000–pound pressurized tank containing compressed oxygen and acetylene" and that "[t]hese materials are

used to produce great heat to weld metals together." (Davis' Response at 7.)

In reply, Victor notes Davis cited no authority in support. Additionally, Victor maintains Davis' contention that the dangerousness of the gauge gave rise to a duty for Victor to test or inspect is without merit.

Victor also cites no authority.

8. Comment *a* to § 400 defines "one who puts out a chattel" as "anyone who supplies it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." The comments also discuss duty, providing:

> One who puts out as his own product chattels made by others is under a duty to exercise care, proportionate to the danger involved in the use of the chattels if improperly made, to secure the adoption of a proper formula or plan and the use of safe materials and to inspect the chattel when made. But he does not escape liability by so doing. He is liable if, because of some negligence in its fabrication or through lack of proper inspection during the process of manufacture, the article is in a dangerously defective condition which the seller could not discover after it was delivered to him.

Restatement (Second) of Torts § 400, comment *c* (1965).

■ Whether Victor is subject to a duty is a question of law. *See Honeycutt v. City of Wichita*, 251 Kan. 451, 463, 836 P.2d 1128 (1992). What, if any, duty to which Victor is subject depends, at least in part, upon whether Victor held itself out as the manufacturer or put out another's product as its own (the apparent manufacturer).[9] If so, Victor is subject to the same liability as U.S. Gauge. Thus, Victor's argument that neither the facts nor the common law give rise to a duty for Victor to test or inspect the gauges must fail. There is a question of fact concerning whether Victor was a manufacturer for purposes of the KPLA or the common law.

Because Victor has failed to establish it is entitled to the retailer exception under the KPLA as a matter of law, summary judgment on this issue is denied.

IT IS ACCORDINGLY ORDERED this 17th day of February, 1994, that Victor's motion for partial summary judgment (Dkt. No. 53) is granted with regard to the loss of consortium issue, and is denied with respect to the retailer exception issue.

---

**9.** As Judge Lungstrum noted in *Richter v. Limax Int'l, Inc.*, 822 F.Supp. 1519 (D.Kan.1993), a manufacturer in Kansas has a duty to test:

> The rule is that a manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, and thereby produces a defective article which causes damage while being put to an ordinary, anticipated use, is liable for such damage.

*Id.* at 1524 (quoting *Lindquist v. Ayerst Lab., Inc.*, 227 Kan. 308, 320, 607 P.2d 1339 (1980) (quoting 1 Hursch and Bailey, *American Law of Products Liability* § 2:29 at p. 214 (2d ed. 1974))).

In discussing comparative fault in Kansas, the Tenth Circuit Court of Appeals has noted:

> Each actor's departure [from his or her duty] is measured from their respective duty of care. Manufacturers have a strict duty in design and production, including the duty to guard against injury to ordinary and even negligent consumers. Distributors also have a strict duty to warn of dangers and to inspect. Consumers have a lower duty of care than manufacturers and distributors, but they still have an ordinary duty of care.

*Prince v. Leesona Corp., Inc.*, 720 F.2d 1166, 1171 n. 9 (10th Cir.1983).